## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
|     **ROGER LOWENSTEIN,** | : | **Chapter 13** |
| | : | |
|     **Debtor.** | : | **Bky. No. 10-14860 ELF** |
| ———————————————— | : | |
| | : | |
| **ROGER LOWENSTEIN,** | : | |
| | : | |
| **LYNNE LOWENSTEIN,** | : | |
| | : | |
|     **Plaintiffs,** | : | **Adv. No. 10-0409** |
| | : | |
|     **v.** | : | |
| | : | |
| **U.S. BANK, N.A., as Trustee of** | : | |
| **Mastr. Adj. Rate Mortgage Mortgages** | : | |
| **Trust 2007-3,** | : | |
| | : | |
| **BAC HOME LOAN SERVICING, LP,** | : | |
| | : | |
|     **Defendants.** | : | |

# M E M O R A N D U M

## I.  INTRODUCTION

Roger Lowenstein ("the Debtor") commenced this chapter 13 bankruptcy case on June

14, 2010.  In this adversary proceeding, filed on October 26, 2010, the Debtor and his spouse,

Lynne Lowenstein (collectively, "the Plaintiffs"), seek to enforce their purported pre-petition

rescission of a residential mortgage transaction pursuant to the Truth-in-Lending Act, 15 U.S.C.

§§1601-1667f ("TILA").  The Defendants are U.S. Bank, N.A., as Trustee of Master Adjustable

Rate Mortgages Trust 2007-3 ("Defendant U.S. Bank") and BAC Home Loan Servicing, L.P.

("Defendant BAC").

Presently before the court is the Defendants' Motion for Summary Judgment ("the Defendants' Motion") (Doc. # 33).  In support of the Motion, the Defendants submitted evidentiary materials, including the transcript of the Debtor's deposition (with accompanying exhibits), the Declaration of Randi McEwing (an employee of the title company that closed the loan) and certain documents that were prepared in connection with the subject transaction.

In responding to the Motion, the Plaintiffs submitted no evidence, agreed that there are no disputed material issues of fact, but asserted that they (not the Defendants) are entitled to judgment as a matter of law.  Although no formal cross-motion was filed, I will refer to the Plaintiffs' request for entry of judgment in their favor as "the Plaintiffs' Cross-Motion."[1]

For the reasons set forth below, and contrary to the parties' agreement on the question, I find that there is a narrow, material factual issue that precludes the entry of summary judgment in favor of either party.  Therefore, I will deny both motions without prejudice.[2]

---

[1]   It is well established that the court may enter summary judgment in favor of the responding party if there are no material factual issues and the non-moving party is entitled to judgment as a matter of law, even though the responding party has not filed a formal cross-motion for summary judgment.  See, e.g., In re Smith, 401 B.R. 674, 688 (Bankr. E.D. Pa. 2009) (citing authorities).

[2]   This court has jurisdiction over this proceeding under 28 U.S.C. §1334(b).  In the Amended Complaint, the Plaintiffs asserted that this is a core proceeding under 28 U.S.C. §157(b)(2).  In their Answer to the Amended Complaint, the Defendants denied that allegation, but failed to state whether they consented to the entry of a final order by the bankruptcy court, as required by Fed. R. Bankr. P. 7012.  In response to the court's order dated September 15, 2011, the Defendants filed a Statement advising that they do not consent to entry of a final order or judgment by the Bankruptcy Court in any non-core proceeding.  (Doc. #'s 38, 40).  In light of the denial of the dispositive motions, I will defer resolution of the issue regarding this court's authority to enter a final judgment.  The issue is not ripe.

Also, due to the denial of the dispositive motions with respect to the liability issue, it is unnecessary at this time to reach various defenses raised by the Defendants that relate to the relief the Plaintiffs have requested.  The Defendants assert that: (1) the Plaintiffs' claim for statutory damages for TILA disclosure violations is time-barred; and (2) TILA statutory damages for either disclosure violations

(continued...)

## II.  FACTS

The following facts are undisputed.

The Plaintiffs jointly own their residential property, 1141 Grovania Avenue, Abington, PA ("the Property").  On February 8, 2007, they refinanced the existing mortgage on the Property ("the Transaction" or "the Loan") through a mortgage loan extended by Countrywide Home Loans, Inc. ("Countrywide").  The original principal amount of the Loan was $262,400.00.[3]

In connection with the Transaction, the Plaintiffs received a TILA disclosure statement ("the TILA DS").  The TILA DS disclosed the amount financed as $260,526.84.  The difference between principal amount of the loan ($262,400.00) and the disclosed amount financed ($260,526.84) is attributable to various charges assessed in the transaction which were treated as prepaid finance charges, including an underwriting fee of $675.00 and prepaid interest of $920.16.[4]  The total finance charge was disclosed as $722,670.28 and the annual percentage rate was disclosed as 8.183%.  (Ex. F to Defs.' Mot.).

---

[2](...continued)
or for the failure to comply with rescission obligations cannot be assessed against the Defendants in their capacities as loan assignee and loan servicer.

[3]       The Amended Complaint refers to a second loan transaction in the amount of $32,800.00, taking place contemporaneously with the Transaction referenced in the text.  In their Answer to the Amended Complaint, the Defendants denied the Plaintiffs' allegation regarding the second transaction.  Then, without explanation, in their Memorandum of Law in support of the Motion, the Defendants asserted, as an undisputed fact, that the second transaction took place.  Because the Plaintiffs' claim relates only to the (first) Transaction, I need not further discuss this potential factual issue.

[4]       The other prepaid finance charges were: (1) tax service fee ($90.00); (2) recording service charge ($10.00); (3) settlement agent/escrow charge ($45.00); (4) courier/express mail closing charge ($107.00) and (5) flood check fee ($26.00).

The loan closing was conducted by Grateful Abstract, LLC ("Grateful Abstract").  (See

Declaration of Randi McEwing ¶2) (Ex. E to Defs.' Mot.) (hereafter "McEwing Decl.").  At the

closing, certain other charges were deducted from the loan proceeds that were not treated as

finance charges, but rather as part of the amount financed.  The Plaintiffs contends, and the

Defendants deny, that three of those charges should have been included and disclosed as part of

the finance charge in the Transaction, rather than the amount financed.  The three charges at issue

are:

    1.  a "closing services letter" charge disclosed as being $35.00, but which was
         assessed twice by mistake, resulting in a total charge of $70.00;

    2.  a notary fee of $25.00; and

    3.  a mortgage recording fee of $131.50.

(See Id. ¶¶3-6).[5]

Defendant U.S. Bank is the present holder of the mortgage securing the subject loan in the

Transaction.  The mortgage is being serviced by Defendant BAC.

The Plaintiffs have defaulted in their repayment of the Loan.  On November 6, 2009,

Defendant BAC commenced a foreclosure action against the Plaintiffs in the Court of Common

Pleas, Montgomery County, Pennsylvania.  On December 10, 2009, the Debtor sent a letter to

U.S. Bank rescinding the Transaction pursuant to TILA ("the Rescission Letter").  (Ex. C to

Defs.' Mot.).  By letter dated January 20, 2010, counsel for BAC responded to the Rescission

Letter and denied that the Debtor was entitled to rescind the Transaction.  (Ex. D to Defs.' Mot.).

 Later in 2010, the Debtor commenced this bankruptcy case and, thereafter, this adversary

proceeding.

---

[5]    I will defer describing some of the factual details relating to these charges until I analyze
their treatment under TILA in Part V., infra.

## III.  LEGAL STANDARDS  – SUMMARY JUDGMENT

The standard for evaluating a summary judgment motion is well established and has been stated in numerous written opinions in this district.[6]  Pursuant to Fed. R. Civ. P. 56(c), summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[7]

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts that are both undisputed and if proven at trial would require a directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  If the movant meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments, through the use of affidavits or other permissible evidentiary material, that demonstrate a triable factual dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986).  Such evidence must be sufficient to support a factfinder's determination in favor of the nonmoving party.  Anderson, 477 U.S. at 250.  Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

---

[6]    E.g., In re Nenner, 446 B.R. 683, 686-87 (Bankr. E.D. Pa. 2010) (per Coleman, J.) In re Pure Weight Loss, Inc., 446 B.R. 197, 202-03 (Bankr. E.D. Pa. 2009) (per Raslavich, Ch.J.); Smith, 401 BR. at 681(per Fehling, J.); In re Total Containment, Inc., 2008 WL 682455, at *2-3 (Bankr. E.D. Pa. Mar. 5, 2008) (per Fox, J.); In re Lilly, 2006 WL 3859124, at *2 (Bankr. E.D. Pa. Oct. 27, 2006) (per FitzSimon, J.); In re LaCheen, 2005 WL 1155257, at *2 (Bankr. E.D. Pa. Apr. 28, 2005) (per Sigmund, J.); In re Lewis, 290 B.R. 541, 545 (Bankr. E.D. Pa. 2003) (per Carey, J.).

[7]    Fed. R. Civ. P. 56 is applicable to this adversary proceeding by operation of Fed. R. Bankr. P. 7056.

In considering the evidentiary matter submitted in support of and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. <u>Anderson</u>, 477 U.S. at 249. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. <u>Id.</u> at 248. All reasonable inferences must be drawn in favor of the non-moving party and against the movant. <u>United States v. 717 S. Woodward St.</u>, 2 F.3d 529, 533 (3d Cir. 1993).

The parties' respective burdens of proof also play a significant role in determining the merits of a summary judgment motion.

If the movant is the defendant or the party without the burden of proof, the movant must demonstrate the absence of a genuine issue of material fact, but the movant is not required to support the motion with affidavits or other materials that negate the opponent's claim. Rather, the movant may assert that the party with the burden of proof has not come forward with evidence to support one or more elements of its claim. <u>See</u> <u>Celotex</u>, 477 U.S. at 323. Thus, for the Defendants to obtain summary judgment with respect to the Plaintiffs' claim, they must show that there are no material facts in dispute and that either: (a) the Plaintiffs have not come forward with any evidence to support an element of their claim or that the undisputed evidence negates an element of their claim. <u>See, e.g.</u>, <u>Newman</u>, 304 BR. at 193-94.

On the other hand, if the movant is the party with the burden of proof at trial, the standard is more stringent. The movant "must produce enough evidence to justify a directed verdict in its favor in order to meet its initial burden." <u>Nat'l State Bank v. Fed. Reserve Bank of New York</u>, 979 F.2d 1579, 1582 (3d Cir. 1992); <u>see also</u> <u>In re Newman</u>, 304 BR. 188, 193 (Bankr. E.D. Pa. 2002). Thus, for the Plaintiffs to prevail on the Plaintiffs' Cross-Motion, they must come forward

with evidence supporting each element of the claim and demonstrate that the Defendants have not

come forward with evidence sufficient to create a triable factual dispute regarding any element of

the claim.

## IV.  THE TRUTH IN LENDING ACT

### A.  Overview

TILA was enacted by Congress in order to promote the informed use of consumer credit.

In re Community Bank of Northern Virginia, 622 F.3d 275, 282 (3d Cir. 2010); Thomka v. A.Z.

Chevrolet, Inc., 619 F.2d 246, 248 (3d Cir. 1980).  To accomplish this goal, TILA mandates that

certain, uniform disclosures be made to consumers in connection with consumer credit

transactions.  It prescribes both the content and the manner in which the disclosures are made.

TILA is designed to be an aid to the consumer so that the consumer is not easily misled as

to the true costs of a consumer credit transaction and to provide some balance to the unequal

positions of borrower and lender in consumer credit transactions.  E.g., Smith v. Fidelity

Consumer Discount Co., 898 F.2d 896, 898 (3d Cir.1990).  For this reason, the statute is liberally

construed in favor of the consumer.  E.g., Roberts v. Fleet Bank, 342 F.3d 260, 266 (3d Cir.

2003).

To implement TILA, Congress delegated to the Federal Reserve Board broad authority to

promulgate regulations regarding the interpretation and implementation of the Act.  See 15

U.S.C. § 1604(a).[8]  The Federal Reserve Board exercised that authority in the regulations codified

---

[8]        TILA was amended in various respects by the Dodd-Frank Wall Street Reform and
Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank Act").
Pursuant to §§1002(12) and 1022 of the Dodd-Frank Act, much of the rulemaking authority under TILA
was shifted to the newly established Bureau of Consumer Financial Protection.

at 12 C.F.R. §§226.1- 226.59, known as "Regulation Z."  In addition, the Federal Reserve Board

staff has issued a Staff Commentary which provides guidance in interpreting Regulation Z  ("the

Official Staff Commentary").[9]  The regulations are set forth in Regulation Z and the Official Staff

Commentary are entitled to considerable deference by the courts.  See, e.g., Ford Motor Credit

Co. v. Milhollin, 444 U.S. 555, 566 (1980); In re Hopkins, 372 BR. 734, 742 (Bankr. E.D. Pa.

2007).

>   In Hopkins, the court provided a concise summary of the TILA's operation:

> > Both TILA and its implementing regulations require creditors to make various
> > disclosures, depending upon the type of loan transaction and the type of security
> > taken.  Certain of these disclosures are deemed "material disclosures" .   .   .   If
> > a lender violates the material disclosure requirements of TILA, a credit consumer
> > may be entitled to rescission of the loan.  If the lender fails to make all required
> > disclosures, even non-material disclosures, the lender may be liable for statutory
> > damages as well as reasonable attorneys' fees.

372 BR. at 742-43 (citations omitted).

>   TILA is enforced primarily through a "private attorney general" scheme, whereby

consumers may recover fixed statutory civil penalties if the required disclosures are not made

correctly.  15 U.S.C. §§1640(a); Thomka, 619 F.2d at 248.

>   TILA is a strict liability statute.  The statutory remedies are enforced in favor of the

consumer in any case in which the creditor violates the specified provisions of TILA, regardless

whether the creditor's conduct was intentional, negligent, or inadvertent.  See, e.g., In re Porter,

961 F.2d 1066, 1078 (3d Cir. 1992).[10]  The technical nature of a violation of the requirements of

---

[9]        The Official Staff Commentary is found in Supplement I to Part 226, 12 C.F.R. Part 226,
and is titled "Official Staff Interpretations."

[10]        The only exception is specified in 15 U.S.C. §1640(c) regarding clerical errors occurring
despite the presence of procedures designed to prevent errors.  This exception does not come into play in
(continued...)

TILA or Regulation Z is no defense to a TILA claim.  See Gennuso v. Commercial Bank & Trust Co., 566 F.2d 437, 443 (3d Cir. 1977) ("Any misgivings about the technical nature of the requirements under the Act or Regulation should be addressed to Congress and the Federal Reserve Board, not to th[e] Court").

Alleged violations of TILA are subject to an objective standard of review with respect to the adequacy of the disclosures.  See Zamarippa v. Cy's Car Sales, 674 F.2d 877, 879 (11th Cir. 1982).  Courts have applied an objective standard regardless of the degree of sophistication of the particular borrower who is asserting a TILA claim.  It is irrelevant whether the particular TILA plaintiff actually relied upon an alleged improper disclosure or suffered any actual harm.  See Porter, 961 F.2d at 1078; Griggs v. Provident Consumer Discount Co., 680 F.2d 927, 930 (3d Cir.), vacated on other grounds, 459 U.S. 56 (1982).

The existence of a private right of action, the strict liability standard for statutory violations, the right to statutory civil penalties without proof of actual damages and the right to attorney's fees for prevailing plaintiffs all are intended to promote compliance by creditors and deter illegalities which would otherwise rarely be uncovered or punished.  See Schnall v. Amboy Nat. Bank, 279 F.3d 205, 216 (3d Cir. 2002); Johnson v. Tele-Cash, Inc., 82 F. Supp. 2d 264, 275 (D. Del. 1999); rev'd on other grounds, 225 F.3d 366 (3d Cir. 2000).

## B.  The Right of Rescission Under TILA

The right of rescission, briefly mentioned above in Part IV.A., applies in a transaction in which a creditor acquires a non-purchase money lien or security interest against a consumer's

---

[10](...continued)
this case.

principal residence.  In such a transaction, a consumer has a right to cancel the transaction ("the

right of rescission") that continues "until midnight of the third business day following the

consummation of the transaction or the delivery of the information and rescission forms . . .

together with a statement containing the material disclosures . . . ." 15 U.S.C. § 1635(a); see also

12 C.F.R. §226.23(a).[11]

In a transaction in which the right of rescission exists, the creditor is obliged to provide

the consumer with a notice of the consumer's right of rescission, as well as the required

disclosures regarding the credit terms.  See 15 U.S.C. § 1635(a); 12 C.F.R. §226.23(a).  Thus, if

a creditor fails to provide a consumer with: (1) a notice of the three (3) day right of rescission that

conforms to the statutory requirements and (2) all of the "material" TILA disclosures, the three

(3) day right to rescind is extended for a period of up to three (3) years.  12 C.F.R. §

226.23(a)(3).

The term "material" disclosures is defined in Regulation Z.  They include some, but not all

of the required disclosures in a consumer credit transaction:

> The term 'material disclosures' means the required disclosures of the annual
> percentage rate, the finance charge, the amount financed, the total of payments, the
> payment schedule, and the disclosures and limitations referred to in §§ 226.32(c)
> and (d) and 226.35(b)(2).

See 12 C.F.R. §226.23(a)(3) n.48.[12]

Regulation Z also sets out the effect of a consumer's valid exercise of the right of

---

[11]        The right to rescind is subject to certain exceptions.  See 12 C.F.R. §226,23(a), (f).

[12]        The disclosures and limitations referred to in 12 C.F.R. §226.32(c) and §226.35(b)(2) are
not at issue in this proceeding.

rescission under TILA:

> (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

> (2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

> (3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

> (4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.

12 C.F.R. §226.23(d); see generally In re Sterten, 352 B.R. 380, 384-85 (Bankr. E.D. Pa. 2006)

(discussing case law concerning implementation of TILA rescission remedy), rev'd on other

grounds, 546 F.3d 278 (3d Cir. 2008); In re Cruz, 441 B.R. 23, 34-36 (Bankr. E.D. Pa. 2004)

(same).


### C.  The Disclosure of the "Finance Charge"

In this proceeding, the Plaintiffs do not question the validity of the notices they received

regarding their right of rescission.  They do assert, however, that they did not receive all of the

material disclosures mandated by TILA.  Specifically, they contend that the TILA DS provided to

them in the Transaction was inaccurate because it understated the amount of the actual finance charge.

TILA disclosures must include a disclosure of the "finance charge," using that exact term, along with a brief description of its meaning.  15 U.S.C. §1638(a)(3), (8); 12 C.F.R. §226.18(d). TILA defines the finance charge as any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.  See 15 U.S.C. §1605(a); 12 C.F.R. §226.4(a).  The statute and regulations contain detailed guidelines for determining whether a particular charge should be treated as a finance charge or, instead, as part of the amount financed in a consumer credit transaction.

TILA also contains different tolerance levels for errors in disclosure of the finance charge, depending upon the nature of the underlying transaction and the claim asserted by the consumer. See 15 U.S.C. §1605; 12 C.F.R. 226.23(f).  In a claim for rescission of a mortgage asserted after the creditor has initiated an action for mortgage foreclosure against the consumer's principal residence, the finance charge error tolerance is $35.00 (hereafter, "the Statutory Error Tolerance").  See 15 U.S.C. §1635(i); 12 C.F.R. 226.23(h).  The parties agree that the Statutory Error Tolerance applicable in this proceeding is $35.00.


# V.  DISCUSSION

The Plaintiffs assert that the finance charge disclosed in the TILA DS was understated by more than the $35.00 Statutory Error Tolerance.  Consequently, the Plaintiffs maintain that:

  • they did not receive all of the material disclosures mandated by TILA;

-12-

- their right of rescission continued beyond the three (3) day period after consummation of the Transaction (for up to three (3) years);

- the Rescission Letter was a valid exercise of their statutory right of rescission; and

- the Defendants violated TILA by failing to comply with their rescission demand.

The Defendants dispute that the finance charge was understated by more $35.00.


### A.  Closing Services Letter Charge

### 1.

The Plaintiffs assert that the entire $70.00 that they were charged for a "closing services letter" should have been included in the finance charge, not the amount financed.  The Defendants concede that the unintended, second $35.00 charge should have been disclosed as a finance charge and that therefore, the finance charge was incorrect.  However, the Defendants assert that the intended $35.00 charge for the closing services letter was properly excluded from the finance charge and therefore, that the understatement of the finance charge does not exceed the $35.00 Statutory Error Tolerance.

In response, the Plaintiffs argue that the entire $70.00 charge was a finance charge  – even the $35.00 charge that was intended for and actually expended for the closing services letter. Consequently, according to the Plaintiffs, the finance charge was understated by $70.00, not $35.00, an amount that exceeds the Statutory Error Tolerance.

The parties' dispute involves a definitional question.  Was the charge for the "closing services letter," by its nature, a finance charge?  If so, the error in the finance charge disclosure

exceeded the Statutory Error Tolerance and a material TILA violation occurred, giving rise to an extended right of rescission in this Transaction.  If not, the understatement of the finance charge by $35.00 is not, by itself, a material TILA violation giving rise to an extended period to exercise the right of rescission.

**2.**

A closing services letter (also referred to in the literature as a "closing protection letter" or an "insured closing letter") is a contract between the title company and the lender whereby the title insurance company agrees to indemnify the lender for any losses caused by the failure of the title agent to follow the lender's closing instructions.  This arrangement is necessary because, while a title agent is the agent of the title insurance company for purposes of selling the title insurance policy (and binding the company to the insurance contract), that agency relationship does not extend to the title agent's conduct at the closing.  Thus, irregularities arising at the closing attributable to the title agent would not be covered by the title policy.  "A lender who also wants the title insurer to be responsible for the agent's acts in connection with escrow closing activities and services must separately contract with the title insurer for such additional protection by entering into an 'insured closing letter' or 'closing protection letter.'" John C. Murray, American Bar Association Report, "Closing Protection Letters: What Is (And What Is Not) Covered," (August 2007), available at http://qa.americanbar.org/content/dam/aba/publishing/rpte_ereport/Murray.pdf); accord Bergin

-14-

Financial, Inc. v. First American Title Co., 397 F. App'x 119, 125 (6th Cir. 2010).[13]

The $35.00 charge in the Transaction for a "closing services letter" appears, at first blush, to have the characteristics of a finance charge. It is a charge imposed on the Plaintiffs, by and for the benefit of the creditor, as an incident to or a condition of the extension of the credit. However, in consumer credit transactions secured by real property, TILA and Regulation Z provide that certain charges, referred to as "real estate related fees," that might otherwise fit the general definition of a finance charge, are nonetheless excluded from the disclosed finance charge, provided that they are "bona fide and reasonable in amount." See 12 C.F.R. §226.4(c)(7); accord 15 U.S.C. §1605(e). Among the real estate related fees excluded from the finance charge are "[f]ees for title examination, abstract of title, title insurance, property survey, and similar purposes." 12 C.F.R. §226.4(c)(7)(i).

As explained below, the $35.00 charge for the closing services letter is a real estate related fee that TILA excludes from the computation of the finance charge.

The $35.00 charge for the closing services letter was imposed in the Transaction to protect the integrity of the lender's title. Considering its purpose and function, I conclude that it was either a charge for title insurance – or, at a minimum, a charge imposed for a "similar purpose[ ]." 12 C.F.R. §226.4(c)(7)(i). The Plaintiffs have presented no legal authority or argument why the charge should not be treated as a "title insurance fee" within the meaning of 12 C.F.R. §226.4(c)(7)(i) and at least two courts have treated closing services letters as being in the nature of title insurance. See Santiago v. Eastern Sav. Bank, 2011 WL 710216, at *4 (E.D. Pa.

---

[13]    The Plaintiffs have not offered any evidence suggesting that the $70.00 charge at issue here was for any purpose other than that described above in the text.

Feb. 28, 2011); <u>Stump v. WMC Mortg. Corp.</u>, 2005 WL 645238, at *3 (E.D. Pa. Mar. 16,

2005).  I will follow the existing case law on the subject.

Because $35.00 of the $70.00 charge was properly excluded from the disclosed finance

charge, the finance charge was understated only by the $35.00 duplicative charge.  <u>See</u> <u>Guise v.</u>

<u>BWM Mtge, LLC</u>, 377 F.3d 795, 800 (overcharge of fee subject to 12 C.F.R. §226.4(c)(7) does

not convert entire charge into finance charge; it establishes that "some amount of the fee was not

eligible from exclusion from the finance charge computation"); <u>accord</u> <u>In re Strong</u>, 2005 WL

1463245, at *4-5 (E.D. Pa. June 20, 2005).  If no other charges were improperly excluded from

the finance charge, the understatement falls within the Statutory Error Tolerance permitted by 15

U.S.C. §1635(i) and 12 C.F.R. 226.23(h).

## B.  Notary Fees

### 1.

Next, the Plaintiffs challenge the exclusion from the disclosed finance charge the $25.00

notary fee.

The notary fee in the Transaction was not paid to the lender (Countrywide).  It was paid

to a third party, Levin & Associates.  (<u>See</u> Ex. B to Defs.' Mot., Line 1106).  Levin & Associates

was the attorney for Grateful Abstract, the settlement agent.  The fee was paid for the

notarization of Plaintiffs' signatures.  Their signatures were notarized eight (8) times on the

documents memorializing the Transaction.  (McEwing Decl. ¶4).

Two (2) provisions of Regulation Z address the treatment of notary fees.

-16-

12 C.F.R. §226.4(a)(2) provides:

> Special rule; closing agent charges. Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor--
>
> (i)   Requires the particular services for which the consumer is charged;
>
> (ii)  Requires the imposition of the charge; or
>
> (iii) Retains a portion of the third-party charge, to the extent of the portion retained.

There is no direct evidence in the record  whether Countrywide required some or all of the loan documents to be notarized at closing, but it is fair to assume that the documents were notarized at Countrywide's behest.  As a result, Regulation Z §226.4(a)(2), on its face, suggests that the notary fees are finance charges.  However, what Regulation Z giveth with one hand, it taketh away with the other.

In a transaction secured by real property, Regulation Z excludes from the finance charge notary fees that are bona fide and reasonable in amount.  12 C.F.R. 226.4(c)(7)(iii); see also 15 U.S.C. §1605(e)(4).  The issue, then, is whether the $25.00 notary charge in the Transaction was bona fide and reasonable in amount.

Notary public fees are fixed by law in Pennsylvania as follows:

| | |
|---|---|
| Executing affidavits (no matter how many signatures) | $5.00 |
| Executing acknowledgments | 5.00 |
| In executing acknowledgments each additional name | 2.00 |
| Executing certificates (per certified copy) | 5.00 |
| Administering oaths (per individual taking an oath) | 5.00 |
| Taking depositions, per page | 3.00 |
| Executing verifications | 5.00 |
| Executing protests, per page | 3.00 |

57 Pa. Stat. Ann. §167.

-17-

The Defendants contend that Grateful Abstract could have charged a notary fee of $31, but only charged $25, (see McEwing Decl. ¶4),[14] and therefore, that the $25.00 charge was bona fide and reasonable.

In response, the Plaintiffs acknowledge that the $25.00 charge for eight (8) notarizations falls within the maximum charges permitted by the Pennsylvania statutory notary fee schedule. But they contend that misses the point.  They argue (and I agree) that the fact that the $25.00 notary charge did not violate the Pennsylvania statutory notary fee schedule is not, by itself, determinative as to whether the charge may be excluded from the finance charge in the disclosure mandated by TILA.  The proper treatment of the notary charges for disclosure purposes requires an examination of TILA and Regulation Z.

The Plaintiffs contend that the $25.00 charge for eight (8) notarizations was not reasonable because the only document that needed to be notarized was the mortgage (at a maximum notarization charge of $10.00).  The Plaintiffs implicitly suggest that Countrywide went "overboard"[15] by requiring eight (8) signatures to be notarized and that it was not reasonable to do so because only one document, the mortgage had to be notarized to be legally effective. Because unreasonable notary fees may not be excluded from the finance charge under 12 C.F.R. 226.4(c)(7), the Plaintiffs urge that at least $15.00 of the notary charge be determined to be a finance charge under TILA.

---

[14]    Mr. McEwing did not explain how he determined that $31.00 could have been charged. Presumably, there were five (5) acknowledgments at $5.00 each and three (3) "additional names" on the acknowledgments at $2.00 each.

[15]    This word is mine, not the Plaintiffs'.

With a proper factual foundation, the Plaintiffs' argument is potentially meritorious. However, the Plaintiffs have failed to present any evidence to support their legal theory.

As a matter of general experience, I am well aware that residential mortgage refinancing transactions are document laden, requiring borrowers to make various representations to the lender in writing and to sign numerous documents. Here, the Plaintiffs did not place the closing documents into the summary judgment record. Consequently, there is nothing in the summary judgment record identifying the documents in the Transaction signed by the Plaintiffs that were notarized. More to the point, there is a judicial consensus that the reasonableness of a charge, for purposes of 12 C.F.R. §226.4(c)(7) is measured by comparing the charge to local industry practice. In re Grigsby, 119 BR. 479, 488 (Bankr. E.D. Pa. 1990), vacated on other grounds, 127 B.R. 759 (E.D. Pa. 1991); accord Brannam v. Huntingdon Mtge. Co., 287 F.3d 601, 606 (6th Cir. 2002); In re Glauser, 365 BR. 531, 535 (Bankr. E.D. Pa. 2007). Yet, the Plaintiffs came forward with no evidence regarding prevailing practices regarding the notarization of documents in residential mortgage loan transactions. In particular, the Plaintiffs offered no evidence tending to show that the requirement that their signatures be notarized on multiple documents other than the mortgage is inconsistent "with the prevailing practices of the industry in the locality." Grigsby, 119 BR. at 488 (quoting R. Rohner, The Law of Truth in Lending, ¶3.03[2][a], at 3–30 to 3–31(1984)).

The Plaintiffs have the burden of proof in this adversary proceeding. In response to the Defendants' Motion, it was their burden to come forward with evidence to support the factual underpinnings of their claim. Satisfaction of that burden required the submission of evidence regarding the documents that were notarized and the industry practice relating to notarization of

-19-

documents in residential mortgage refinancing transactions.  The Plaintiffs failed to meet their

burden because they did not produce any evidence that requiring eight (8) notarizations at a cost

of $25.00 was inconsistent with industry practice and therefore, was unreasonable.  As a result,

the Defendants are entitled to a determination that the notary charge was properly excluded from

the disclosed finance charge pursuant to 12 C.F.R. §226.4(c)(7).  See Fed. R. Civ. P. 56(g).[16]

### 2.

The Plaintiffs also cite 12 C.F.R. §226.4(e) and the Official Staff Commentary thereto as

an alternative ground why the notary charge was erroneously excluded from the finance charge.

12 C.F.R. §226.4(e) provides:

> Certain security interest charges. If itemized and disclosed, the following
> charges may be excluded from the finance charge:
>
> (1) Taxes and fees prescribed by law that actually are or will be paid to
> public officials for determining the existence of or for perfecting, releasing,
> or satisfying a security interest. . . .

The Official Staff Commentary to §226.4(e) states:

> Notary fees. In order for a notary fee to be excluded under §226.4(e)(1), all of
> the following conditions must be met:
>
> > I.   The document to be notarized is one used to perfect, release, or
> > continue a security interest.

---

[16]     Rule 56 is incorporated in this proceeding by Fed. R. Bankr. P. 7056.  Rule 56(g)
provides:

> If the court does not grant all the relief requested by the motion, it may enter an
> order stating any material fact—including an item of damages or other relief—that
> is not genuinely in dispute and treating the fact as established in the case.

      ii.  The document is required by law to be notarized.

      iii.  A notary is considered a public official under applicable law.

      iv.  The amount of the fee is set or authorized by law.

The Plaintiffs' reliance on Regulation Z §226.4(e) is misplaced.

Section 226.4(e) may not validate the exclusion of the notary charge from the finance charge, but nothing in Regulation Z suggests that it is the exclusive vehicle for doing so. Indeed, 15 U.S.C. §1605(e)(4) provides that fees for notarizing deeds "and other documents" are items to be excluded from the finance charge in consumer credit transactions secured by an interest in real property. Also, the provision in Regulation Z corresponding to §1605(e)(4), 12 C.F.R. §226.4(c)(7)(iii), authorizes the exclusion of bona fide and reasonable notary fees from the finance charge in real estate transactions and does not limit the  notary fee exclusion those notarizations necessary to perfect, release, or continue a security interest.

In short, satisfaction of the requirements of Regulation Z's §226.4(c)(7)(iii) makes §226.4(e) irrelevant. It follows that the Plaintiffs' argument that the notary fees should have been included in the finance charge because the charge does not satisfy the requirements of 12 C.F.R. §226.4(e) is without merit as a matter of law.


### C.  Mortgage Recording Fee

In the Transaction, the Plaintiffs were charged a mortgage recording fee of $131.50. That fee had two components: $126.50 paid to the Recorder of Deeds and a $5.00 "service charge for using the county's electronic recording system." (McEwing Decl. ¶6).

The Plaintiffs do not dispute that $126.50 charge paid to the Recorder of Deeds was

properly excluded from the finance charge pursuant to 12 C.F.R. §226.4(e)(1).  They question, however, whether the $5.00 service charge was properly excluded from the finance charge.  In response, relying on the McEwing Declaration but without identifying the recipient of the $5.00 "service charge," the Defendants conclusorily characterize the entire $131.50 charge as a "fee prescribed by law and paid to a public official for the purpose of recording a mortgage."  (Pls.' Mem. at 11).

I find that there is a disputed issue of fact regarding the $5.00 service charge because the McEwing Declaration is ambiguous regarding the precise nature of the charge and is susceptible to being read to in a manner that could support either side's position in this proceeding.

The McEwing Declaration can be interpreted to mean, as the Plaintiffs' suggest, that the $5.00 charge was paid to governmental officials as an additional fee (additional to the $126.50 fee paid to the Recorder of Deeds), required to be paid in order to record the mortgage.  If so, the Declaration is drafted poorly because it does not make this clear.

At the same time (, the Declaration's characterization of the fee as a "service charge" creates a significant ambiguity and implies that the $5.00 fee was paid to some entity other than the Recorder of Deed.   The use of the term "service charge" (particularly without identifying the payee) implies that the $5.00 fee may have been paid to Countrywide or its agent as an additional charge for accessing the county electronic recording system (similar to the "service charge" assessed by agencies that sell tickets on-line for entertainment and sporting events)  –  as opposed to being a separate fee paid to a government official other than the Recorder of Deeds.  If the fee was retained by Countrywide or a related private entity, the charge cannot be excluded from the finance charge under 12 C.F.R. §226.4(e)(1).  See Official Staff Commentary §226.4(e)(1)(i)

-22-

("Sums must be actually paid to public officials to be excluded from the finance charge under §
226.4(e)(1)") (emphasis added).

Until the identity of the $5.00 service charge payee is identified, it is impossible to
determine whether the charge was properly excluded from the finance charge pursuant to 12
C.F.R. §226.4(e)(1).

## VI. CONCLUSION

As explained above, there is one disputed factual issue remaining with respect to issue of
liability on the Plaintiffs' TILA rescission claim.  That factual issue involves a nominal loan charge
of $5.00 for a mortgage recording fee "service charge."  However, because the Statutory Error
Tolerance in this proceeding is only $35.00 and it is undisputed that the finance charge was
understated by $35.00 in TILA disclosures provided to the Plaintiffs, a finding that the $5.00
mortgage recording fee "service charge" is a finance charge would result in the determination that
the erroneous finance charge disclosure exceeded the Statutory Error Tolerance and that there
was a material violation of TILA, giving rise to an extended right of rescission.

In short, there is a factual issue regarding the proper disclosure of the $5.00 charge and
that issue is material.  Consequently, both parties' motions for summary judgment must be denied.

Because the factual issue is both narrow and one that I suspect may not truly be in dispute
once the parties further examine the issue, I will deny the motions without prejudice and give both
parties a short period of time to submit additional evidentiary materials and legal argument in

support of their positions.  See Fed. R. Civ. P. 56(e).[17]

In addition, pursuant to Fed. R. Civ. P. 56(g), I will enter an order treating the facts that

are not genuinely at issue as "established in the case."

An order consistent with this Memorandum will be entered.

**Date:** **October 5, 2011**

_____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

---

[17]   Rule 56(e) provides:

If a party fails to properly support an assertion of fact or fails to properly address
another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

*   *   *

(4) issue any other appropriate order.